UNITED STATES of America, Appellee,

v.

Geary David POWELL, Appellant,

UNITED STATES of America, Appellee,

v.

James F. BARFIELD, Appellant,

UNITED STATES of America, Appellee,

v.

Bill BARFIELD, Appellant.

No. 84–2430.

United States Court of Appeals,
Eighth Circuit.

Submitted March 11, 1985.

Decided Sept. 4, 1985.

Darrell Brown, Little Rock, Ark., for appellant.

Gloria C. Phares, Dept. of Justice, Washington, D.C., for appellee.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and SACHS,* District Judge.

* The HONORABLE HOWARD F. SACHS, United States District Judge for the Western District of Missouri, sitting by designation.

BOWMAN, Circuit Judge.

Geary David Powell, James F. Barfield, and Bill Barfield appeal from their convictions on two counts of transporting illegal aliens and aiding and abetting each other in that offense, in violation of 8 U.S.C. § 1324(a)(2) and 18 U.S.C. § 2. On appeal, they allege error in the District Court's [1] denial of their motion for judgment of acquittal, failure to grant a mistrial after the prosecuting attorney corrected a supposed error in the translation of a witness's testimony, and failure to grant a mistrial for alleged prejudicial pretrial publicity. Finding no error in the District Court's rulings, we affirm.

## I.

Pedro and Rufino Astello illegally crossed the Mexican-American border into Texas on or about December 20, 1983. They traveled on foot to San Diego, Texas, where they arrived in about ten days. There, they met Homero Gonzales, who asked if they were looking for work. Pedro provided Gonzales with a piece of paper containing James Barfield's number.

Gonzales called James Barfield and told him that two of Barfield's former workers had arrived in San Diego looking for work. James told Gonzales that he and his son, Bill Barfield, would come and pick up Pedro, Rufino, and other alien workers to be provided by Gonzales. Gonzales testified that James Barfield paid him $50 for each worker so provided.

On December 31, 1983, Bill and James arrived at San Diego and received Rufino, Pedro and eight other illegal aliens to work in a pine tree farm owned by the Barfields and Geary David Powell. James Barfield spoke in Spanish to the men, and told them to crouch down in the back of the Barfields' truck and try to avoid being seen during their journey. The Barfields covered the men in the back of the truck and left for the Barfields' home in Arkansas. When they arrived in Arkansas the following day, Powell greeted the aliens and asked them, in Spanish, how their trip from San Diego had been. The aliens went to work on the pine tree farm and lived in houses provided by Barfield and Powell.

In March 1984, Powell told the aliens that there was no more work and that they would have to leave. They refused to leave because Powell still owed them money. Powell promised to send the money to them in Mexico as soon as his buyer paid him. The Astellos protested because Powell had broken similar promises when they had worked for him in the past. They left, however, after Powell shut off the water in their houses. The Barfield-Powell involvement with illegal aliens was revealed to the authorities by the Astellos when they were arrested shortly after leaving the pine tree farm.

At trial, the government's principal witnesses were Homero Gonzales and Pedro and Rufino Astello. Their testimony, in essence summarized *supra*, implicated Powell and the Barfields in the transportation of the Astellos from San Diego, Texas to Gillham, Arkansas. Evidence was also introduced showing that both Powell and James Barfield had telephoned Gonzales in San Diego to arrange for acquiring illegal alien workers. After a two-day trial, the Barfields were convicted of transporting illegal aliens and Powell was convicted of aiding and abetting that offense. This appeal followed.

## II.

### A. The Prosecutor's Correction of the Interpreter's Translation.

During direct examination of government witness Pedro Astello, Pedro was asked how long he was in the truck on the trip to Gillham, Arkansas. The transcript of this and what followed is set forth below:

Q. About how long were you in the back of the truck?

---

1. The Honorable George Howard, Jr., United States District Judge for the Western District of Arkansas.

A. About two hours, two.

Q. About how long?

A. About two hours.

Mr. Webb: Your honor, I think the witness is saying twelve, but I believe the interpreter is saying two.

Trial Transcript at 24. At that point the defense moved for a mistrial, alleging that the prosecutor's comment had so prejudiced the jury that a fair trial could not be had. The trial court denied the motion for a mistrial, but did instruct the jury to disregard the prosecutor's comment regarding the accuracy of the translation. On appeal, plaintiffs contend that the trial court erred in its failure to grant a mistrial for the prosecutor's misconduct.

■■■ The grant of a mistrial for prosecutorial misconduct is appropriate if the conduct complained of is so prejudicial that the defendant is deprived of a fair trial. The grant or denial of a motion for mistrial is placed in the sound discretion of the district court and may only be reversed on a showing of abuse of discretion. *United States v. Krevsky*, 741 F.2d 1090, 1094 (8th Cir.1984). While we agree that the prosecutor's attempt, in the presence and hearing of the jury, to correct the interpreter's translation was improper, in the circumstances of this case we find no abuse of discretion in the District Court's refusal to grant a mistrial. An immediate objection was lodged and the District Court promptly instructed the jury to disregard the prosecutor's comment. The prosecutor did not attempt any similar correction during the remainder of the trial. Moreover, the defendants were not prejudiced by the attempted correction, because the government's case did not rest solely on that part of Pedro's testimony. Several questions later in his testimony, he stated (through the interpreter) that the trip to Gillham took twelve hours. Trial Transcript at 28. His brother, Rufino, also testified that the trip to Arkansas required twelve hours, and Homero Gonzales testified that the Barfields came to pick up the Astellos under circumstances that strongly indicate that they knew they were transporting illegal aliens. The Astellos also implicated Powell in the scheme, through his prior dealings with the Astellos and his actions at the time the Astellos arrived in Arkansas and thereafter. Given this strong evidence of guilt, it is clear that a single instance of improper comment by the prosecutor, for which a cautionary instruction was promptly given, did not deprive the defendants of a fair trial.

### B. Prejudicial Publicity

■■ On the second day of trial, an article appeared in the *Texarkana Gazette* about the trial. The article erroneously reported that defendants' counsel had stated that defendants admitted to transporting the Astellos from Texas, but that they denied knowing that they were aliens. After the jury had begun its deliberations, defense counsel drew the court's attention to the article, and requested that the court ask the jurors if they had seen the article. Trial Transcript at 283. While defense counsel was researching the issue, the jury reached a verdict. Following the verdict, the District Court conducted a private interview with each juror in the manner prescribed by *United States v. Hood*, 593 F.2d 293, 296 (8th Cir.1979), in order to determine if any of the jurors had read the article and if it had affected their verdict. Only one juror had read the article, and he stated that he could not remember what it had said, that he had not discussed it with any other juror, and that it had not affected his vote. Defendants moved for a new trial, arguing that the article had substantially prejudiced their rights.

■■ The trial court has broad discretion in ruling on whether publicity concerning the case has tainted the jury's deliberations. *Krevsky*, 741 F.2d at 1093. We find no abuse of discretion in this case: the jury was instructed several times to ignore all media coverage of the case and discussion of the case other than in the course of their deliberations, and the one juror who had read the article could not even remember what it had said. Moreover, appellants did not even raise the issue of the effect of the article until after jury deliberations had begun, and consented to the procedure used by the district court in questioning the jurors. Once such consent has been given,

the defendants "cannot be heard to complain of the manner or scope of the inquiry". *United States v. Word*, 519 F.2d 612, 615 (8th Cir.1975), *cert. denied*, 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1976).

### C. Sufficiency of the Evidence

■ Appellants also contend that there was insufficient evidence to support their convictions. The jury's verdict must be sustained if there is substantial evidence in the record supporting it, viewed in the light most favorable to the government. *Krevsky*, 741 F.2d at 1095. Having reviewed the record, we find ample evidence to support the verdict. There was direct testimony by the Astellos that the Barfields took them from San Diego to Gillham under circumstances which strongly inferred that the Barfields knew the Astellos were illegal aliens. For example, during the journey the Barfields took precautions to prevent anyone from knowing they were transporting the workers. *See United States v. Perez-Gomez*, 638 F.2d 215, 218 (10th Cir.1981). We are satisfied that the evidence provided the jury with an ample basis for finding the defendants guilty beyond a reasonable doubt.

For the reasons stated above, the convictions are affirmed.